Sharice Roney representing Johnny Davis. May it please the Court, Counsel, this is an appeal from a decision in Con-Way Freight's favor on a summary judgment. The District Court found that decision makers at the time of termination did not know of Johnny Davis' cancer disability and did not regard him as being disabled. Is that dispositive of both of your claims on appeal? I'm sorry. Isn't that the pivot point for this appeal? That is. So the issue before the Court is did the Court err given the substantial evidence to the contrary? Substantial evidence to the contrary? Tell us just one particle of evidence to the contrary. There are multiples. The first, so there are four, if one were to simply read the District Court's opinion, there are four key areas that were not highlighted that were missing if we were to just read their opinion. Didn't both Heathrow and Hohner or Hewner, I don't know how you say that name, testify that they didn't know? They did. The substantial evidence to the contrary. So I'm looking for other evidence in the record that would contradict that testimony, right? Yes. Okay. So first. Saying Heathrow or Withrow and Hewner are dishonest is not enough, is it? No. Okay. I'm just trying to make sure that I'm with you. And I want to point, I want to serve two minutes for rebuttal if that's possible. The evidence of the suspension and the facts surrounding the suspension and that Davis was regarded as disabled at that time was completely ignored by the facts, by the Court below. And the significance of those, they're intertwined inextricably, the suspension with the termination. And it's the evidence surrounding those facts that I want to highlight that's uncontroverted facts that establish an inference of knowledge of the cancer and actual knowledge. Counsel, this is what we know. This is what we know because we've read the briefs thoroughly. But what we just really want to focus on, you needed to raise a material issue of fact about this point in time. It's very specific in this case. That's why we're trying to call your attention to it. So what tells us there was a material issue about whether the decision makers knew? The first is a telephone call between Johnson and Withrow that happened on the 12th in the morning between 8 and 9 a.m. And during that call, what we know and what's uncontroverted is that Johnson told his boss Withrow at that time that two people had come to him, Terrell, who is the person who helped Johnny Davis into and was concerned about his state into the building when he was crying and shaking, and Mark Cam, who is the safety instructor of 25 years, who when Johnny Davis, his first concern when he saw Johnny Davis was his, does he need medical attention? At that time, Davis told Cam he wasn't feeling well, he hadn't been feeling well, he was having issues with his health, problems with his medication, and generally was having a rough time. That's ER 88 at paragraph 4. Well, but you're making a claim of disability discrimination. Yes. So it's, and the disability is leukemia, correct? Yes. So I'm back to the question that I think my colleagues have been asking you. What evidence is there that these two decision makers knew of the disability? Not that Mr. Davis might not be feeling well after this episode on the 12th. What evidence is there that they knew he had leukemia? Because that's the disability you rely on. There are, the evidence is regarding the phone call that happened. Well, you've just told me about the phone call, but there's nothing in that phone call that would lead me as a decision maker to have any knowledge that Mr. Davis had leukemia. We know he was very upset and there were people who were worried about his health, but tell me what there is that would give the decision makers any notice that he had leukemia. The phone call is truly important because the purpose of the call was Johnson calling his boss and telling him we've suspended somebody without pay. That is an adverse action because he's unfit to work. But that was because of the damage, the unreported damage, right? No. Actually, there's no evidence in the record that that phone call had anything to do with the unreported damage. Well, he'd blown up that morning, and to use a strict legal term, he'd blown up at the supervisor and there was an incident, correct? That's construing the facts. He had had a meltdown and was tearful. Okay, I'll use meltdown rather than blow up, better legal term. You used blow up and it was meltdown. It was a meltdown, I'm sorry. But could they fire him for his insubordination to the supervisor? There could be discipline, but that was not what the discipline was for. There's nothing in the record to indicate it's anything but because they knew he was unfit to work, because he had a reoccurrence, he was under tremendous amount of stress at that time. Okay, so go back to my original question. Whether or not you think it's important, I do. Tell me what evidence there is that these people knew that he had cancer. The evidence is that it was in the record. Because that phone call doesn't help you on that point, in my view. So tell me what else there is. Okay. So besides the fact that there was the phone call, there was a fax sent on November 12th. And the fax on the November 12th, which is a 22-page fax that happened before the second fax that the district court focuses on, is the out-of-service. Now, I apologize for going back to the phone call. The fax was sent because Withrow said, send me the statements of the three people who are concerned about his health and put it with the out-of-service documents, which had never been filled out until this turn of events suddenly on the 12th, that now this out-of-service is being filled out for a week-old routine error. Right. So it's not an old error. To be fair. It's seven days. It's seven days before. But the policy says that you immediately put somebody out of service if they fail to report according to Conway's construction of a policy that was not applied before the 12th. Okay. So let's go back. On the 4th, he has the incident with the truck. Yes. On the 12th, there's the blowup. Meltdown. Emotional. Okay. Related to the disability. Okay. Fair enough. That's what you're saying. I'm still trying to figure out how the decision makers knew that he had leukemia. Tell me that. Mark Cam's note says he's going through some health issues, he's unfit for work, and he's got a record since 2004 of leukemia in the local personnel manager's file, that the local personnel manager testifies. He takes things up to his boss. All paperwork goes through her. Okay. So the best evidence you have, it seems to me, is that some documents passed through the hands of one of these decision makers in which had they looked through them, they could have discerned that he had leukemia. Is that it? That's not my best, no. What's your best? So my best, and it's regarding different pieces. So we've got the local management, we've got Withrow, the decision maker. Local management didn't fire him. So I want to know, focus on my question. I will. Because, you know, you may not think it's important, but as I say again, I do. Tell me what evidence that these two decision makers, the ones who decided to fire him, there is that they knew that he had leukemia. Not that they knew that he was upset or that people were worried about his health or any other general issue. Tell me what specific evidence there was that they knew that he had leukemia. The slice in time of Withrow, there is only the facts of November 12th, and it is not direct evidence of knowledge. Okay. It is indirect evidence. It may not be necessary, but thank you for that. It's not direct evidence. Okay. The best that we have on November 12th, isn't it, that Pierce sends an e-mail to Johnson, not Withrow? And then Withrow agreed with Pierce that he shouldn't drive? So I didn't complete my comments on the 22-page facts. Yes, we know there's three statements. I mean, all I'm trying to do is I looked at what it is Pierce sent to Johnson. I have nothing in the evidence to say Withrow got it. All I know is that Withrow agreed with Pierce that your client should not drive. But I don't find anything in there that the not driving has anything to do with the disability. It has to do with the way he was acting on that particular day, which no one said related to the disability. It was just the way he was acting. Everybody was concerned about his health at the local level. Everybody's talking about his health on the 12th. Withrow asks for three statements. The out-of-service says include statements. On the 12th, a document is sent that's 22 pages, three pages of which are missing in the record. And in those three pages, those are the statements, and this is in 167 to 186. If you look at the last page, it is a confirmation of the first page, and it shows 19 pages only in the record. The importance of these, and it shows a 22-page facts one on ER-222. The importance of this facts on the 12th is that she asked for the statements. A jury could infer those statements were provided because they're required under the out-of-service, which is only filled out if there's a terminable offense. She asked for them, and at the end of that day at 4 p.m., she got them. Okay. I understand your argument. What about the CAM typewritten statement? That? I don't know that that was ever received by Withrow, was it, until after he already, after he was already, after Withrow had already said he should be fired. Which is? I mean, he already, or she. Withrow had already made that decision by the time they would have received the typewritten statement. So the importance of that, again, is looking at a slice in time. First, an inference can be made that it got through, it was one of the three missing pages. Second, Johnson admits he told his boss, Withrow, what CAM said. So I've got to jump to the conclusion that it got through, the inference is enough that it got through in order to make your argument? You don't have to get to that inference unless you want the direct evidence. You have Johnson saying he told his boss what CAM, that CAM had come to him. And that's at 331 to 333 in the record. I understand that this particular statement expressed, did not expressly say anything about the cancer. It said that he was going through some health issues, and it was well known what his health issues are. And so a reasonable inference is that Johnson is informing his boss completely, fully. Well, when I read that, I didn't see anything about the cancer. It says that he has, he should take. It says he has health issues, but that's all it says. But the point of that last sentence, which is not, which CAM says somebody typed up for him mysteriously, which in and of itself is suspect, is that it says the theory of the case that is plaintiff's position, that he should take time off due to his health and focus on getting well and safety, which is the code word for health. He's going through some health issues, has been under a lot of stress, and should take time off to get refocused. The adverse action of the suspension itself is related to his health and being unfit. That deserves a jury trial in and of itself, but the suspension is inextricably tied to the termination. Is bad health a disability for purposes of the act? And being regarded as disabled, I'm sorry, say the word again. I'm asking, I think I'm asking a question you can answer yes or no. Is someone, just because someone is not healthy, is that a disability for purposes of the act? Yes, if you're being deemed unfit to work and regarded as disabled. And regarded as disabled is part of the claim. Well, that's a lot of additional facts other than the one I'm asking. I'm just asking, you say his employer said, well, he doesn't seem to be in good health. I'll assume that to be true. If he were fired under those circumstances and they cited the accident and the meltdown, as you call it, would that be sufficient to show a pretext? There is a wealth of pretext in the record, so not in and of itself, no. Well, well, well, well, stop. Tell me what the wealth of pretext is. Comparator evidence at ER, at the reply brief on page 25, a wealth of comparator evidence. Nobody has ever been fired for this before in the company. There's been a situation in the company before where somebody failed to report an accident and then had a meltdown a week later? No, there's nothing in the record to say the meltdown was a cause of the termination, not even in the briefings. They're saying it's inconsequential. There's nothing in the record to say the meltdown was insubordination. So do you have evidence that other folks failed to report accidents and were not fired, or do you just have evidence that nobody's ever been fired for this? We have evidence, yes, to your first question. And at page 25 in the reply brief. No, cite me the record, because the reply brief doesn't help me. Okay. So in the record, and the reason I report to the reply brief is because there's multiple places in the record. Just give me one. So the E.R. So Garcia and Russo are the two individuals who weren't fired. It is at 232 to 237 and 242 to 243 for Garcia that he caused an accident, 235. Okay. No, they caused the accident. That's not the question I'm asking. Did they fail to report the accident? Yes. They caused it, failed to report, were put out of service in one day, had prior history, had a second. Both of them had second 541 violations, which Davis did not have, and both of them had prior discipline, which Davis did not have. So your position is that the meltdown was not one of the causes of the adverse action in this case? My position is he was regarded as disabled that day, and it is. Congress, no. No, don't. Please, just I'm asking a very simple question. Your position is that the meltdown, as you call it, was not one of the causes for the adverse action? That's not my position. Okay, so. Could you just try this one more time then? What is your position? He was regarded as disabled. Locally, not by the decision makers. You keep saying that, and I just want to be clear. Sure. The decision maker is Withrow. I know that. She affirmed the regarded as disabled as unfit to work and the suspension without pay on the 12th. Yes. Okay, but let me go back to my question. It's a different question than the one you're answering. Okay. I'm sorry. Go ahead and answer, Judge. The answer to Judge Kristen's question. So did you say that you think there was not any evidence? This is what I really want to know. Maybe I misheard you. Did you say that you think there wasn't evidence of insubordination? There wasn't evidence that he was written up as insubordinate, and that was a reason for the termination. Okay, so I'm looking at this is the Dean Pierce, right? Yes. I asked him to go get the paperwork and bring it to me, and he said he was not moving from this spot. I gave him an order to go get his paperwork, and then he can punch out and go home, and he said, no, I'm taking a break. Is your characterization of this that this was not insubordination? My characterization is Conway did not write him up or terminate him for insubordination, and that's never been an argument they've made. It's not in the record that that was a reason for termination at the ETRB level. Thank you. I think your time has been passed long ago. Thank you very much. Good morning, Your Honors. May it please the Court, Paul Buchanan for Conway Freight and the Conway defendants in this case. I want to kind of back up a little bit and point out as an initial matter that as I perceive the Court is understanding, we do have the two decision-makers here. The final decision-maker was Mr. Huener and Ms. Withrow recommended termination. And as previously discussed here, there isn't evidence that either of these people who were in Denver had never met Mr. Davis in their lives to this day. They don't have to have met him. It's a large outfit. Absolutely. And her argument, and I think her strongest one, is that he had been ill for a very long time. Yes. And that he'd had a series of, I'll just say correspondence, but that could be electronic or otherwise, where he's had to get doctor's notes and whatnot over a period of years. And at some point, the interim Withrow became the, I'll say middle man, but the person who was receiving that documentation. Isn't that her strongest circumstantial evidence that Withrow knew? I don't think she even has. I think that's even. So here's the question. Isn't that her strongest circumstantial evidence that Withrow knew, or is there stronger? I certainly don't think there's stronger, so. Okay, so let's go with that. I'm just not sure there's even that, quite frankly, Your Honor. Why not? Why not? Isn't it clear that Withrow became the person who received that information at some point? Who would have received it? I don't know whether he actually requested time off during that segment after Withrow assumed those duties. I'll give you that. And I look for it. I can't find it. Yes. But I just really want to make sure that we've got the facts right because there's a lot of fuzziness. And, you know, I think it sounds like all three of us have tried to carefully make timelines here. Yes. So is it correct that Withrow became the person who would have received that kind of documentation if it had been forwarded? No, I don't believe that is correct, Your Honor. Well, who would? I think it is. Somebody else in HR. There wasn't. I believe Mr. Johnson may have received some of that. Are you suggesting? No. I mean, I understand what my colleague is really asking you. Yes. And I guess I don't find in the record where you're going. It seemed to me that Withrow came to this job after other conversations or other circumstances may have, if you will, transpired. And Withrow did not necessarily know of them in the position that Withrow was. And, therefore, you're saying Withrow has no knowledge. No actual knowledge. I am saying that she testified that she has no actual knowledge. I understand her actual knowledge, but I guess I'm going to take up Judge Kristen's crucible just a little bit. If she goes into the same position as the one prior or the one who should or would have received all of that knowledge, how do you get away with saying, well, she didn't know it, so, therefore, there's no way that this case could provide? It seems to me that when she gets the position, she naturally has the knowledge of all those who were in the position before and should have acted with the full knowledge of the person who was in the position before. She can't get away with saying, well, I'm just new on the job, and, therefore, I can do whatever I want to do. May I, Your Honor, may I back up and sort of make a sort of threshold point that I think is really important here and kind of getting lost in the shuffle? And that is if we think about almost any discrimination case that this court would typically deal with, the decision-makers are well aware in almost every case of the person's protected characteristic. So if this were a gender discrimination case, say, it wouldn't be lost on the decision-makers that they were terminating a woman or a man, whatever it is. Or if it was a race discrimination case, the decision-makers typically are aware of the person's race, of the protected characteristic. We all agree. And we know that. It doesn't get you anywhere. But that's not the issue. Let me try this question slightly differently. Maybe the third time's the charm. If you look at the file here, the entire file, there are at least some evidence in that file from which a reasonable person could infer that Mr. Davis had leukemia or cancer, correct? Oh, he has leukemia and cancer. We're not disputing that. That's not what I'm asking. I'm asking if one looks at the file, which is in the record, one could infer from that file that he has leukemia. Certainly. Okay. So the question in my mind is, what significance is there that the file passed through many hands in the company and eventually made its way up to the decision-makers? They say they didn't read it or look at it. But can we infer — At least not before the decision was made. Not before the decision was made. But can we infer from the fact that it was available and it was in the department that one of them headed that it's possible that they read it? Could a reasonable jury infer from that that it's possible that they read the file? Certainly. I mean, that's possible. It's not only possible they read it, but they are seized with the knowledge therein if they had access to it. That would be no more relevant than in a gender discrimination case, the decision-maker knew that the plaintiff was a woman. That doesn't get you anywhere in terms of advancing the ball. No, but the district court in this case, based its findings as I read it, is saying these actions could not have been discriminatory on the basis of Mr. Davis' leukemia because the decision-makers were unaware of Mr. Davis' leukemia. Now, let's assume they were aware of Mr. Davis' leukemia. Sure. Do you still get summary judgment? Absolutely. Why? Well, this is a case actually where I think the McDonald's — He's in a protected class. That doesn't get you there. That's all that we — I know. So let me walk through it. We're talking about the stuff we agree on. He's in a protected class, correct? Sure. Yes. An adverse action occurred, correct? Yes. Doesn't that raise a presumption of — a rebuttable presumption of — No, it doesn't, Your Honor. — a violation for which your client then has to come back with evidence that there was no pretext? No, Your Honor, because the prima facie case has four elements to it. And you've just named two, which in your paradigm he has made out. Of course, yes, there's an adverse action. And actually in my paradigm, too. And of course, yes, he's disabled. But was he performing his job satisfactorily at the time of the discharge? That's critical. There's a question of fact about that. No. He says, I was, yeah, I had a minor mishap, but most people who had that minor mishap don't get fired. So he's — There's no evidence of that. Well, your colleague says there's evidence that other people had mishaps, didn't report them, and weren't fired. My colleague respectfully misrepresented that fact. Both those individuals were fired for — Mr. Garcia and Mr. Roycer were both fired for the very same conduct, failure to report an accident. So not only is there no evidence of somebody who was not fired, all the evidence in this record is that everybody disabled or not disabled who engaged in this conduct was fired. See, and that's why I asked your colleague that question, because it seems to me that if I come at this case in the traditional way and say, let's assume that he showed a discriminatory — an action, made his prima facie case. Let's assume that your reason for it was we didn't fire him because of a disability. We fired him because he had an accident. And then I have to figure out whether or not she's presented any evidence that that was a pretextual reason. And that's how I would do it if I got to that third step. Let me ask a different question. Do you agree that he wasn't fired because of the meltdown, blowup, whatever we call it? I do agree with that. I don't think that that was a reason that was ever cited. So it's only the accident we should be focusing on. It's the failure to report quite specifically. Right. And do you agree that there's a question of fact about whether the people who fired him knew that he had leukemia? I actually don't agree with that, Your Honor. Okay. I thought you had a moment ago. So tell me — No, no. I was accepting that for purposes of your question. Okay. So tell me why that's not enough evidence from which we can infer that they knew. Again, because mere knowledge that somebody has a legally protected characteristic, as virtually every human being does — See, but that's where I'm having difficulty with your answer. That's not enough to prove discrimination. Or to create a prima facie case. I understand. But I'm asking a very different question. I guess I'm asking it poorly. Is there a question of fact in this record about whether or not the two people who made the decision to fire Mr. Davis knew that he had leukemia? I'll answer — there's a two-part answer here. One is, no, I don't think so. The other is, it doesn't matter. Forget part two. Okay. Forget part two. Tell me why, in light of the facts that we've all been asking about, a reasonable juror couldn't infer that at least one of these decision-makers had knowledge of visual leukemia. Well, first of all, the actual decision-maker was Mr. Huener, who is in Los Angeles, and testified that he had no knowledge that Mr. Davis had any medical condition, that he'd never heard anything about that. I don't think there's any evidence that passed through his hands along the way that would have led us to believe that. There is not. What's your focus on? Is it — Withrow. Withrow. Ms. Withrow. Okay. So Ms. Withrow recommended termination. That's true. Right. And as the district court recited, she only — the argument, as I understand it, and it's not completely clear to me, but the argument from plaintiff's counsel is that, as I understand it, is that there was a 20-some page or maybe 40-some page fax that included one document that had the word Gleevec on it, which is apparently the medication that Mr. Davis was taking. Well, it also says oncology. It's pretty clear. It's a pretty clear indication. Yeah. If somebody had taken a chance to — the opportunity to look at it. Right. It's very clear. And I believe it's the case, although I don't think any of this is relevant, as I say, I believe it is the case that the fax shows that she received that after she recommended termination. Yes. Right. Okay. So now we get back to the question Judge Smith was asking, which is that she was previously in a different position. She was previously in a different position within Conway, you're suggesting. Right. Can we make a reasonable inference from her — from the positions that she occupied in Conway that she knew or should have known? I don't, frankly, think there's anything in this record about what prior positions she held. In fact, I don't think she'd have been employed at the company very long. Okay. But she moved — she's in a position that, in effect, supervised — She inherited her predecessor's knowledge — the file. And so this goes back to what I think is the strongest evidence they've got. It's circumstantial, to be sure, but opposing counsel acknowledged that, and that's why we're just trying to get your response to it. And that would be the circumstantial evidence, the inference that she knew, Withrow knew, because she's in this position where these, I'm going to say, medical notes and permission slips, doctor's notes and whatnot, had been forwarded in the past. And I think her best response, in addition to saying, I didn't know, and as a matter of fact, Withrow says that clearly, is that she didn't sort of, you know, retrospectively look through that file, certainly not before she made the decision. But what Judge Smith and perhaps now all three of us have asked is, what is your response to that, the argument that Withrow could have known, that a reasonable juror could determine that she's got this information? And, you know, the slip doesn't just have the name of the medicine. It says oncology, hematology on it. So that's it. Which, you know, again, she received after she recommended the termination. She received the file after the termination. The question is, can we reasonably infer, given her position in the company, that she might have seen this at some earlier point? The worry I have, just to let you answer, is that if she knows, if you're not even arguing that she would have known he had a cancer problem, because she came to the position and it was in the file that there was such a problem, then you're saying, even if that were it, she still has no responsibility. Why not when this breakdown happens on November 12th, and she knows that the claimant had a breakdown, and that breakdown was about this situation that had confronted the person. Why isn't that enough?  Senator, there's anything about the breakdown that suggests that it's related to leukemia or that any reasonable person would perceive this breakdown as having something to do with some actual disability, as opposed to somebody who felt he was about to get disciplined and possibly fired, which is obviously stressful. Forgive me for interrupting. A juror could certainly, I think there's evidence of insubordination in this file, and the meltdown on that morning alluded to that. So that was certainly reported. And really the whole pivot point, I think, is whether jurors could decide that that wasn't the reason, because there was indication that morning that there was concern about his health. He'd had some health issues. I don't see the word cancer anywhere that morning, for sure. But this is, I think, the closest they come. So I have the same question Judge Smith has. I just want to hear your response to that. I think I would say to respond to your earlier question, Judge, is the issue of did Ms. Withrow somehow inherit this knowledge? The actual testimony on this is. She's the keeper, then, of the file is what I'm talking about. She's not, Your Honor. I'm not talking about her. She is not. Well, counsel, there's record evidence. Go ahead. I don't believe that's correct. Mr. Johnson, who is the personnel person on site in Clackamas, is the keeper of that file. Yes. She requested it following the recommendation for termination. Right. She requested it. But she didn't inherit that file. It was a file that's kept locally. As I said, we've got really detailed timelines, and mine is just consistent with what you're telling me. But I really want you to have an opportunity to answer this question, unless you don't want to take it. I do want to answer the question. I'm just not sure what the question is, Your Honor. I truly do. I think the question is, Withrow approved the medical leave request. Not only did Withrow approve the medical leave request, Withrow also knew about the breakdown on November 12th on that morning, and, therefore, is that enough to suggest that Withrow knew? Your Honor, Withrow did not approve any medical leave request. Or that there's evidence. Pardon me? Ms. Withrow did not approve any medical leave request. There was no medical leave request while she was employed that I am aware of. That's what I can't find record of, that these doctor slips and permission slips that I'm referring to, using a loose and imprecise term, went to anywhere in the company while she had that position. I can't find that. Yes. And, Your Honor, that's because under the Americans with Disabilities Act, there's pretty strict rules about separating medical information from personnel information. And, therefore, I think that, given the circumstances in which it would be typical for an HR generalist to get medical information, unless there was some specific business reason for her to know that. Can I just ask one? I appreciate that. Can I just ask one follow-up question? What is your response to this odd allegation that never gets really kind of teed up very well about Cam's statement being typed up and part of it he seems to disavow? What is your response to that? Yes, Your Honor. That came up in opposition to the summary judgment in a declaration that was filed for the first time. So I know about that, about what Your Honor knows about that. I don't. We haven't had an opportunity to pursue that. There's no explanation of how that was prepared, that statement? I think he's simply incorrect in that he typed it up. He says, I don't recall typing it. That's all he says. He doesn't say he didn't. No, he doesn't say he didn't. I have looked in the record for explanation of it, and maybe the answer is I can't find it because it's not there. I think that's right, Your Honor. Can I ask another question about something that's not in the record, Judge Smith? I know we've taken him over. It's okay. No, no. It's on the medical leave request. As I understand the records, but I need your help on this, Mr. Davis says, I made a medical leave request at some point in the past, and Ms. Withrow approved it. But there's no evidence in the record of a medical leave request, and there's no evidence showing that she approved it. Is his testimony on that point enough to create an issue of fact about whether she knew? What does he say about why he thinks she approved it? I'm not even familiar. I don't recall him testifying. There's nothing in this record about a medical leave request, and there's no approval of it in the record. The question is, what was his testimony on that point, and does that create a question? And his testimony that comes closest to that, in my view, is he testified that this whole incident, and he testified to this very clearly in deposition, this whole incident with him failing to report this damage, had nothing to do with his disability. And, in fact, his disability was in remission as a result of this medication. But that's not the question I asked. The question I asked is, what did he say about this leave request? I don't recall, Your Honor, him saying anything about it. Okay. And I'm trying to find it. It's argued in the briefs, and I'm trying to focus in on that issue. I was trying to do the same. That's why I've been going through. I don't believe it exists, Your Honor. Okay. I think you're finished. Thank you. If you'd like a minute, I'll give you a minute. I think we took you over, but. There's two tracks that the plaintiff can prevail on. One is the actual knowledge and inferred knowledge for the disability of cancer and the perceived disability, as well as the second track, which we haven't talked about, which I'm not going to talk about now because it's brief, the cat's paw and subordinate bias. The second thing that I think is important is knowledge, an inference of knowledge, plus the timing of the adverse action, plus the wealth of pretext evidence that is the comparator evidence, the failure to treat him the same way as everyone else, the issue of Ben Mandel, who is somebody who was not fired. He is in the record at 255 to 259. He caused an accident. He caused property damage to a customer. He failed to report. He covered it up. He was terminated, and the ETRB reversed. That did not happen for Johnny Davis, with a much better record. Who reversed? The ETRB is the appeal board who had direct evidence. That's right, but the company took exactly the same action against him, did they not? The company fired him, but the point of the other two companies. So how does that show that their firing of your guy was a pretext? Johnny Davis did not cause damage. He didn't have an accident, unlike all the other comparators. He had no, and the two that were fired, Reusser and Garcia, have very different records. Okay, but I asked you this before, so let me make sure, because your colleague says you're wrong. Is there any evidence in this record that somebody who had an accident and didn't report it was not fired? He didn't have an accident, so no. That's not the question I asked you. The question is whether there's any evidence in this record that anybody in the company who had an accident and didn't report it was not fired. No, but Ben Mandel was brought back, and he was reinstated. Okay, so the answer is no? No. Okay. Thank you. I think you've taken your time. Thank you. Appreciate your arguments. Thank you very much. Case 15-35864, Davis v. Conway, is submitted.
judges: N.R. Smith, Christen, Hurwitz